RECEIVED
USDC, WESTERN DISTRICT OF LA
ROBERT H. SHEMWELL, CLERK
ALEXANDRIA, LOUISIANA
DATE 07/19/05
BY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| JOHN DESLATTE | CIVIL ACTION NO.: 04-2038 |
| VERSUS | JUDGE LITTLE |
| COMM. OF SOCIAL SECURITY | MAGISTRATE JUDGE KIRK |

REPORT AND RECOMMENDATION

This case comes before the Court for a review of the final decision of the Commissioner of Social Security ("Commissioner"), denying John Deslatte, Supplemental Security Income ("SSI") benefits under the Social Security Act ("SSA"). The issue to be decided is whether substantial evidence in the record supports the finding of the Administrative Law Judge ("ALJ") that Deslatte is not disabled and thus not entitled to supplemental security income benefits.

Deslatte was born in 1972 (Tr. 63), has a college education (Tr. 190), and has past work experience as a bagger/stocker and non-certified teacher. He filed an application for SSI on September 27, 2002, alleging a disability onset date of December 31, 1996, due to epilepsy and a right hemianopia. (Tr. 63-66, 74.) Deslatte's claim was denied initially, and a request for hearing was timely made. A hearing was held on December 15, 2003 (Tr. 183-225), at which Deslatte appeared and testified, unrepresented by counsel. Deslatte's mother appeared and testified at the hearing, as did Harris Rowzie, a vocational expert ("VE"). (Tr. 199-224.) The ALJ issued a decision unfavorable to the claimant on April 27, 2004, and Deslatte filed a request for review with the Appeals Council. The Appeals Council denied review, and the decision of the ALJ became the final decision of the Commissioner.

To qualify for SSI benefits, a claimant must file an application and be an "eligible individual"

as defined in the Act. 42 U.S.C. 1381(a). Eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. 1382(a). To establish disability, a claimant must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than 12 months. A claimant must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 42 U.S.C. 1382(a)(3).

## Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether the decision comports with relevant legal standards. McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401 (1971). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, re-weigh evidence, or substitute its judgment for that of the fact-finder. Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. Allen

v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981). Also, Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992). The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. Dellolio, 705 F.2d at 125. But, to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

## Issues

Deslatte raises the following issues for review:

(1) Whether the ALJ failed to properly develop the record in light of Deslatte being unrepresented by counsel;

(2) Whether the ALJ erred in assessing Deslatte's residual functional capacity; and

(3) Whether the vocational experts testimony should constitute substantial evidence of non-disability at Step 5.

## Factual Background

Deslatte was born in 1972. He completed high school and graduated from college with a Bachelor of Science degree in General Studies. (Tr. 190.) He was one test away from certification, and, at the hearing, testified that he was looking into taking that test to become certified. (Tr. 190.) Deslatte last worked as a teacher in May 2002. (Tr. 74.) In his Disability Report, Deslatte claimed that he could not work because of a loss of peripheral vision in his right eye and seizures. (Tr. 74.)

Deslatte treated with Dr. H. Stanley Culbertson from November 2001, through November 2003. (Tr. 117-126, 157-174.) Upon examination, Dr. Culbertson noted that Deslatte was remarkable for a right homonymous hemianopia[1] as well as some subtle reflex predominance to the

---

[1] Blindness in one-half of the visual field of both eyes. www.medlineplus.gov.

right as well. (Tr. 124.) Dr. Culbertson noted complex partial epilepsy related to childhood history of a left ventricular choroid papilloma treated surgically at eight months of age with good post operative appearance on CT scan of brain in 1995, and controlled by the medications Tegretol and Phenobarbital. (Tr. 124.) Dr. Culbertson noted the presence of surgical clips from Deslatte's surgery. The doctor recommended that Deslatte continued taking Tegretol and Phenobarbital and added Neurontin 300 mg, anticipating an increase in dosage. (Tr. 125.) Deslatte was instructed to return in one month or sooner if necessary, but he failed to show for his December 19, 2001 appointment. (Tr. 121.) Deslatte reported again to Dr. Culbertson on January 22, 2002, claiming that, despite the addition of Neurontin, he had suffered from some mild seizures on December 27, 2001, January 4, 2002, and January 5, 2002. (Tr. 118.) Dr. Culbertson instructed Deslatte to follow up in six months, but Deslatte failed to appear for the appointment. (Tr. 117.)

Nonetheless, Deslatte returned to Dr. Culbertson on May 5, 2003. Deslatte was working approximately four hours per week (Tr. 179) until March 2003 as a tutor for the Ball and Tioga school systems (Tr. 172). Deslatte's wife informed Dr. Culbertson that her husband was having one to three seizures a month, about half of which were mild and half were more severe. (Tr. 172.) None involved convulsions. When experiencing a seizure, Deslatte experienced speech arrest and then extension of the right upper extremity. (Tr. 172.) Deslatte indicated that the seizures caused no bowl or bladder incontinence or tongue biting. Dr. Culbertson noted that Deslatte wanted the doctor's help in "getting a declaration of Total and Permanent Disability in order to write off some educational loans." (Tr. 172.) The doctor noted that such a declaration at this stage "might be a stretch." Dr. Culbertson noted that Deslatte was doing some yard work and odd jobs. The doctor noted that Deslatte had a propensity for "no show incidents." (Tr. 173.) Dr. Culbertson prescribed

Depakote and ordered that Deslatte stop taking Neurontin and return in one month for a follow up visit. (Tr. 173-174.)

Deslatte reported to Dr. Culbertson on June 9, 2003. (Tr. 168.) He advised that he remained seizure-free for the past month. (Tr. 170.) Dr. Culbertson noted that Deslatte decided to reduce the amount of Depakote he was taking based on his own review of the Physician's Desk Reference. (Tr. 169.) Deslatte returned to Dr. Culbertson's office on August 13, 2003, reporting that he was still seizure-free since May 5, 2003. (Tr. 165.) Dr. Culbertson opined that some of Deslatte's stability relates to the fact that he finally got his student loans paid for. Dr. Culbertson noted that Deslatte passed the first three of four tests to become a certified teacher, but failed the fourth and final test six or seven times. (Tr. 165.) Objectively, Dr. Culbertson found that neurologic exam remained normal and unchanged, remarkable for old right homonymous hemianopia. The doctor advised Deslatte to taper and eventually discontinue Phenobarbital. (Tr. 167.) Dr. Culbertson noted that Deslatte lost his job with the Rapides Parish school system after having a seizure at work and experiencing a loss of awareness of behavior. (Tr. 168.) The doctor noted that seizures seem worse in relationship to stress. (Tr. 172.)

On October 17, 2003, Deslatte reported to the emergency room with convulsions after stopping the Phenobarbital. (Tr. 167, 161.) He also reported that he suffered a Petit Mal seizure in August. Dr. Culbertson decided to put Deslatte back on a low dose of Phenobarbital. Deslatte was instructed to see Dr. Ugokwe for an opinion as to whether or not Deslatte would be a candidate for Vagal Nerve Stimulator placement. (Tr. 158.)

A report from the Welch Eye Center indicates that Deslatte was seen there on November 29, 2000. Corrected acuity was 20/30-1 in the right eye and 20/30-2 in the left eye. (Tr. 128, 145.) Slit

lamp examination revealed clear corneas, deep and quiet anterior chambers, and clear lenses. OU Funduscopic exam revealed a cup-disc ratio of .3, OU with temporal pallor. (Tr. 128.) A negative afferent pupillary defect was noted. (Tr. 128.)

A Disability Determination Services Eye Examination Report was completed on November 14, 2002, by Dr. Kenneth C. Lafleur, an ophthalmologist. (Tr. 129-133.) Dr. Lafleur found that Deslatte suffered from a right hemianopia. (Tr. 129.) Dr. Lafleur opined that Deslatte was restricted from climbing or working at heights, driving an automobile, operating machinery, and contact sports. (Tr. 129.)

A June 11, 2004, letter from Dr. Rajinder Verma states that Deslatte is disabled and unable to work. (Tr. 178.)

## Law and Analysis

Issue No. 1: Whether the ALJ failed to properly develop the record in light of Deslatte being unrepresented by counsel

Deslatte claims that the ALJ failed to properly develop the record in light of Deslatte being unrepresented by counsel. The Commissioner has failed to reply to this issue. At the hearing before the ALJ, Deslatte informed the ALJ that he was to undergo a procedure ordered by Dr. Ugokwe. (Tr. 202, 203, 213, 214.) Deslatte testified that the procedure was scheduled for February 11-12, 2004[2]. (214-215.) The ALJ informed Deslatte that he would obtain the additional medical records from Dr. Ugokwe before making his decision. (Tr. 223.) Deslatte argues that the ALJ erred in not obtaining those medical records, thereby violating his duty to properly develop the record. (Doc. #6, Exhibit

---

[2]Deslatte's brief indicates that the forty-eight hour EEG actually took place in March 2004. (Doc. #6, p.4.)

6

A.)

Deslatte argues that, had the ALJ had this additional evidence, a finding of disabled would have been reached at Step 3 of the evaluation process. The ALJ has a duty to develop the facts fully and fairly relating to an applicant's claim for disability benefits. If the ALJ does not satisfy his duty, his decision is not substantially justified. Reversal of his decision, however, is appropriate only if the applicant shows that he was prejudiced. See Ripley v. Chater, 67 F.3d 552, 557 (5th Cir. 1995). Deslatte argues that he was prejudiced by the ALJ's failure to obtain records from Dr. Ugokwe because, had the ALJ reviewed the records, he would have found that Deslatte met or medically equaled Listing 11.03. (Doc. #6, p.4.)

While the ALJ failed to obtain the supplemental records from Dr. Ugokwe as promised, and while the Commissioner failed to address this issue altogether in his brief, Deslatte has not shown that he suffered actual prejudice due to the ALJ's failure. Deslatte claims that Ugokwe's report supports the other medical reports in the record. While this is true, Deslatte has not established that he meets or medically equals all of the requirements of Listing 11.03. The listing refers to nonconvulsive epilepsy, documented by detailed description of a typical seizure pattern including all associated phenomena, *occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment*, with alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

Deslatte has established that he suffers from epilepsy, documented by seizures in spite of three months of treatment, with alteration of awareness, etc. However, he has not shown, and does not argue, that he suffers from seizures occurring "more frequently than once weekly" in spite of treatment, as required by Listing 11.03. (Doc. #6, p.4.) A claimant has the burden of proving his

7

condition meets or medically equals an impairment listed in Appendix 1. See Sullivan v. Zebley, 493 U.S. 521 (1990). "For a claimant to show that his impairment matches a listing, it must meet **all** of the specified medical criteria. *An impairment that manifests only some of those criteria, no matter how severe, does not qualify.*" Id. (emphasis added). Deslatte has failed to show that he was prejudiced by the ALJ's failure.[3]

Issues No. 2 and 3: Whether the ALJ erred in assessing Deslatte's residual functional capacity, and whether the vocational experts testimony should constitute substantial evidence of non-disability at Step 5.

Next, Deslatte argues that the ALJ erred in assessing Deslatte's residual functional capacity ("RFC"). The ALJ determined that Deslatte had the RFC to perform a wide range of light work, limited by the following limitations: no climbing or working at dangerous heights, no driving or operating dangerous machinery,[4] no contact sports, and limited peripheral vision of the right eye. (Tr. 19.) The ALJ erred in finding that Deslatte had limited peripheral vision of only the right eye. The records actually show, as indicated herein, that Deslatte has limited peripheral vision in the right visual field of *each* eye, not just the right eye. (Tr. 124, 196.) Dr. Culbertson opined that Deslatte would probably be subject to at least occasional convulsions even on optimum trials of various anticonvulsant agents and combinations of anticonvulsant agents. (Tr. 158.)

The ALJ has the responsibility for deciding a claimant's residual functional capacity. 20

---

[3]While Dr. Ugokwe's report from Deslatte's 48 hour EEG shows that Deslatte had a number of seizures in a 48-hour period (Doc. #6, Exhibit A), he was not taking any of his seizure medication at the time, as was a requirement of the study being conducted (Tr. 214).

[4]Deslatte claims that the ALJ failed to include a limitation of his ability to drive in the RFC; however, the RFC as outlined by the ALJ contemplates that Deslatte cannot drive.

8

C.F.R. § 404.1546. The ALJ must perform a "function-by-function" assessment of the claimant's ability to engage in work-related activities when making his RFC determination. SSR 96-8p. When making the RFC determination an ALJ must consider objective medical facts, diagnoses and medical opinion based on such facts, and subjective evidence of pain or disability testified to by the claimant or others. 20 C.F.R. § 404.1545(a). Moreover, the ALJ must specify the evidentiary basis for his RFC determination. SSR 96-8p. Myers v. Apfel, 238 F.3d 617, 620 (5th Cir. 2001). Here, the record supports a limitation based on Deslatte's limited peripheral vision in both eyes as well as his inability to drive. The ALJ erred in failed to recognize this limitation in his RFC and hypothetical questions presented to the VE.

First, before being presented hypotheticals, the VE was asked whether any jobs existed, other than school systems, that would tolerate seizures that would last about an hour and occur once every two weeks. (Tr. 216.) The VE testified there were such jobs, including a vocational rehabilitation counselor or a social services aide at a rehabilitation facility. (Tr. 216-17.) Then, the ALJ asked the VE to assume a claimant who could perform work that does not require climbing or working at heights and does not require driving or operating dangerous machinery, that does not require good peripheral vision, especially on the right side, and had to be "off task" for one hour every two weeks. (Tr. 217.) The VE testified that there were jobs such a claimant could perform: assembler (census code 785), production inspectors, checkers and examiners (census code 796), and hand packers and packagers (census code 888)[5]. (Tr. 218.) The ALJ added in the second hypothetical a restriction that the claimant be "off task" one hour every week, and the VE testified that such a claimant could

---

[5] The VE testified that his testimony regarding census job descriptions did not conflict with information contained in the Dictionary of Occupational Titles. (Tr. 219.)

9

still perform the jobs listed. (Tr. 219.) Finally, the ALJ asked a third hypothetical adding a restriction that the claimant was unable to work eight hours a day for five days a week, to which the VE responded that there would be no available jobs. (Tr. 219.)

Deslatte argues that the hypothetical questions were defective in that they did not specify when the "hour off task" would occur, for example, is the "hour off" simply Deslatte's lunch hour, or did he consider an additional hour during the working day. (Doc. #6, p.7.) Deslatte argues that the hypothetical also failed to include a limitation based on Deslatte's sleepiness caused by the medication, as well as the fact that his seizures were uncontrollable[6] and resulted in some uncontrollable behavior[7]. "Uncontrollable behavior" (Tr. 168, 200-201, 204-206) or "lack of awareness of surroundings" (Tr. 168) following a seizure could have an effect on Deslatte's ability to obtain and maintain employment and should have been considered by the ALJ. Unless the hypothetical questions posed to the vocational expert by the ALJ can be said to incorporate reasonably all disabilities of the claimant recognized by the ALJ, and the claimant or his representative is afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions, a determination of non-disability based on such a defective question cannot stand. See Boyd v. Apfel, 239 F.3d 698, 706-707 (5th Cir. 2001), citing Bowling v. Shalala, 36 F.3d 431, 436 (5th Cir. 1994).

---

[6]Dr. Culbertson opined that Deslatte would probably be subject to at least occasional convulsions even on optimum trials of various anticonvulsant agents. (Tr. 158.)

[7]Deslatte had approximately five seizures while working at Ball Elementary, and was fired from his position while employed with Aiken's Optional Job Training Center due to uncontrollable behavior, specifically, urinating in a closet, while he was disoriented following a seizure. (Tr. 200-201, 204, 205-206.)

10

Furthermore, the ALJ should rely primarily on the Dictionary of Occupational Titles ("DOT") for information about the requirements of work in the national economy. See SSR 00-4p. Here, when the ALJ asked the VE whether there were any jobs that a claimant with Deslatte's residual functional capacity could perform, the VE cited no occupations from the Dictionary of Occupational Titles. Rather, he referenced occupations by census codes. While the VE testified that the census jobs did not conflict with the DOT classifications, the ALJ failed to elicit testimony regarding the restrictions of those "census code" jobs. Deslatte points out that the DOT jobs of "assembler," "production inspector, checker and examiner," and "hand packer/packager" all require frequent fingering, reaching, and handling, as well as good hand/eye coordination. (Doc. #8, p.4.) Further, those jobs are usually performed in a warehouse and would require Deslatte to be around machinery. The Court finds that the ALJ failed to properly assess Deslatte's RFC by omitting the aforementioned limitations in his assessment and in the hypothetical questions posed to the VE.

Finally, the record lacks substantial evidence as a whole to support the Commissioner's decision of non-disability. The Commissioner claims that Deslatte had been able to control his seizure activity with medication. However, according to the record, Deslatte continued to experience seizures despite taking medication prescribed by Dr. Culbertson. In fact, Dr. Culbertson opined that Deslatte was probably subject to convulsions even on optimum trials of various anticonvulsant agents. (Tr. 158.) Deslatte could not have a driver's license because he had not been seizure free for six months. (Tr. 195.) Further, while Deslatte missed a number of appointments with Dr. Culbertson, Deslatte claims that he missed appointments because he could not afford them due to his inability to work or drive. (Tr. 179, 182.)

11

## Conclusion

For the foregoing reasons, I find that the record does not contain substantial evidence to support the Commissioner's decision regarding Deslatte's residual functional capacity, ability to perform the jobs listed by the VE, and ultimate decision of non-disability. Thus, the decision is incorrect as a matter of law. It is recommended that the case be REMANDED to the Commissioner for a consideration of all of Deslatte's impairments supported by the evidence of record as discussed herein, for a consideration of Dr. Ugokwe's reports, for new hypothetical questions incorporating all limitations to be posed to a vocational expert, and to determine whether Deslatte can perform the specific occupational requirements for the jobs listed by the VE, who should utilize the DOT job classifications in forming his opinion.

## **OBJECTIONS**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the clerk of court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the district judge at the time of filing. Timely objections will be considered by the district judge before he makes his final ruling.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT UPON GROUNDS OF PLAIN ERROR, FROM**

ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.

THUS DONE AND SIGNED in chambers, in Alexandria, Louisiana, on this the 18th day of July, 2005.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE